Please be seated. All right, thank you everyone. The final case on calendar for argument today is Nevada Resort Association-International Alliance of Theatrical Stage Employees, etc. versus J.B. Viva Vegas. Good morning, Your Honors. Good morning. Eric Field on behalf of the appellant, J.B. Viva Vegas, who I refer to as Jersey Boys for our simplicity. You refer to us what? Jersey Boys, just to keep it simple. I request to reserve two minutes for our rebuttal. All right. You've just heard argument on one of the exceptions to ERISA's withdrawal liability rules, the construction rule. This case is about a very similar rule, but that covers employers in the entertainment industry. Unlike the construction rule, the entertainment rule actually does define who is an entertainment employer. And one of the category of entertainment employers are producers of run-of-the-show projects, such as the appellant here who produced Jersey Boys that ran for approximately eight years in Las Vegas. Under this exception, the employer is not liable for withdrawal liability when the show ends, so long as during the show it makes all of its contributions, which Jersey Boys did. It paid 1.5 million dollars of contributions over its eight-year run. And so long as when the show ends, the employer doesn't start a new show without contributing, but it either contributes for its next show or it just leaves the jurisdiction. In this case, Jersey Boys closed. The appellant left the jurisdiction. Under the entertainment rule, there should be no liability. The rationale for the entertainment rule, as well as the construction rule, is that unlike many industries, there are certain industries where just because an employer leaves doesn't mean that the plan is harmed. And that is because the work is unique in that it has to be done in the jurisdiction of the plan or the jurisdiction of the CBA. If I want to put on a Broadway show and I want to do it at a theater in Las Vegas, I can't take it with me to get out of my contribution obligation. When the show runs, I contribute. When I leave, the theater doesn't go dark. Another show is going to come in. Jersey Boys closed almost 10 years ago. As anyone knows, there's still plenty of theatrical productions going on in Las Vegas, and there's plenty of stagehands work. So that is why we have the rule in the first place that you can leave the territory, someone else comes in, and someone else will contribute. I'm sure we're going to hear the fund argue, well, these rules need to be narrowly tailored to protect the fund. We're not asking for a broad interpretation. We're just asking for you to apply the statute as it's plainly written, that if a plan covers employees who are in the entertainment industry, primarily covers employees who are in the entertainment industry, that plan is an entertainment plan. And any employer in that plan who is one of the defined entertainment employers gets the benefit of the rule. We're not asking you to say that any employer in the plan gets the rule. If, as they say, a lot of their employers are no longer entertainment employers, fine. Those employees don't get the rule. But that doesn't mean the entertainment employees don't get the rule. They want to argue that, well, we're not even an entertainment plan anymore because even though over 80% of our employees, our plan participants, do some work in the entertainment industry, you don't count. You only count if 50% of your work or more, excuse me, more than 50% of your work is in the entertainment industry. They do not get that language from the statute. The statute says nothing about any minimum requirement. It just says the plan primarily covers. So the first primarily, we agree, that means at least more than 50% of your employees, participants, have to work in the entertainment industry. But the next phrases are in the entertainment industry. There is no qualifier. Congress knew how to put the qualifier at the beginning. In fact, Congress knew how to put qualifies throughout ERISA section 4203. Substantially all, primarily, more than insignificant. Those qualifies appear throughout, throughout 4203 and throughout other parts of ERISA, but not with the fund claims it is. It's not the... And how does this apply in your view to a... Suppose you have an employee and he has one job and some of his job involves things that fall within the definition of the entertainment industry and other parts of his duties don't. Is he in the entertainment industry? Oh, I'll give an example. If I'm working, on Monday and Tuesday, I'm working at a theater production. Whether I'm building the stage, I'm operating the lights, I'm running the sound. If it's a theater show, that's what I'm going to be doing because everything I do for that employer is for that show. That's entertainment work. If Wednesday through Saturday, I work at another employer who's not an entertainment employer, I might not be doing entertainment work on those days, but how can you say I'm not in the entertainment industry on Monday and Tuesday? If I'm not in the entertainment industry in those days, what industry am I in? I mean, suppose... I mean, so the entertainment industry includes music, right? Yes. So I mean, I'm sure you've been to the sort of restaurant where when it's somebody's birthday, all the waiters come out and they sing happy birthday to the patron. Would you say that all of the waiters at the restaurant are in the entertainment industry? Because for a few minutes out of a 40-hour work week, they're engaged in a musical production? They're getting paid to serve tables and serve food in the restaurant. They're in the restaurant industry. Just like if I'm singing in the shower, I'm not in that industry. It's part of their job duties, right? The employer is telling them, like, whenever it's somebody's birthday, you have to go and sing, right? I believe there's a distinction where my primary work function is serving tables and I might have to go out and sing happy birthday, especially when my employer is clearly in the restaurant industry, not in the music industry. But I would say at the end of the day, it doesn't really matter because even if you say they are in the entertainment industry, that restaurant still wouldn't get the role because the restaurant is an entertainment employer. Because you have to be a music employer, a theater employer, a dance employer. So it's kind of a red herring because it doesn't really matter. They're concerned that if we say that someone who works 10% of the time or I'll say works Monday in entertainment and the rest of the week for non-entertainment, that's going to mean everyone's going to walk away from the plan. It's not because if every employer only has Monday to work in the entertainment industry, no one's going to qualify for the rule. They're not entertainment employers. It's not just being an entertainment plan. You have to be an entertainment employer. And that's the part they leave out. Council, would you agree that the Amendment 7 would preclude Jersey Boys from being included within the exception? If it was permissible? Yes or no. Does Amendment 7 preclude application of the exception to Jersey Boys? If it's legal? Right. If it's legal? If it's legal, yes. Okay. So now tell us why it's not legal. Because ERISDA is very specific on what you can and cannot do. And it says these group of members of employers are exempt from withdrawal liability under the entertainment rule. Theater, dance, music, audiovisual, etc. But then it says either the PBDC can exclude or add, which is never done, or the plan itself could include or add a group or member employer, which is defined above as the music, dance, theater. But that's not what they did. They tried to exclude based on operations. I mean, excuse me, based on length of contributions and amount of contributions. They don't try to do what the statute says they can do. If they wanted to, they could have passed an amendment that said the entertainment rule does not apply to theater employers. That's a group of classes defined by the statute. They're allowed to do it. They could have done it. We wouldn't be here. Jersey Boys would have paid their withdrawal liability. I won't say happily, but they would have paid it, gone on their way, and we don't have this case. But that's not what they did. They tried to single out based on the time and based on the amount. And not only does it not comply with 4203, that that exception that allows them to exclude employers, it also doesn't comply with section 1384, 29 U.S.C. 1384, excuse me, 1394, that requires any plan amendment or rule to apply uniformly to all employers. So did the PBGC implicitly approve the amendment? No, all the PBGC did is years and years ago, they, because the statute, as I explained, because the statute allowed for plans to exclude dance, theater, music employers, whatever, as long as one of those classes, PBGC did a blanket approval that said, if all you're going to do with your amendment is exclude one of these classes, you don't need to come to us. And they did that because generally under 4220, there is a section 4220, so 29 U.S.C. 1400. Generally, whenever you pass an amendment, you have to go to PBGC for approval. Right. But they say, if you're just excluding one of these classes, don't have to come to us. It's also important to note that if you look at 1400. Well, well, well. Oh, so let me, okay, yeah. In this case. So in this case, all they said was, we're not going to open a case. Well, it said the request appeared to be covered by its earlier class approval, so it would not open a case on it. Just meaning that we have a class of, when entertainment plans want to exclude classes, we have already addressed what you can do. Go look at that. It doesn't say what you're doing is okay. More importantly, if you look at. Who is supposed to take from that? The fact that the PBGC said, because the request appeared to be covered by its earlier class approval. Isn't that an implicit approval? Well, keep in mind that under 1400. Could you say yes or no? Was that an implicit? Could we read that as an implicit approval? No, and because of under 1400, PBGC doesn't actually approve the rule. All PBGC does under the statute is it looks at your rule and it determines if it's consistent with ERISA. We're not saying whether or not it is consistent with ERISA. We're saying if it is, we don't think it harms participants or the PBGC if you go forward with that rule. That's what the statute says. So at most, PBGC was saying, yeah, we don't think your rule will hurt us, PBGC or your planned participants. It's not saying that your rule is consistent with ERISA because the PBGC doesn't do that. It's in the statute. It's not part of their approval process. So I would say no, it's not an implicit approval. And Amendment 7 clearly is contradicted by the statute that says you can only exclude based on the definition of group or member, which again, broken record, but theater, dance, movie, visual, or it also violates the requirement that rules apply universally to all employers. So you can't say under 1394, what you can't do is say, you theater employer, you get the rule. You theater employer, you don't get the rule. Under their argument, they would say, you theater employer, because your show was a flop and ended in three months, you can walk away and not pay liability. You theater employer, because you're producing Hamilton and you're going to be running for 20 years, you don't get the rule. They can't do that. Well, the theory was that the plan was originally intended for short-term productions and one short-term production after the other, as opposed to long-term productions. And why was it illegal for them to make that distinction? Well, the rule says temporary or project. A project can last depending on however long and successful the project is. Some shows in alleged history, they talk about Broadway shows being eligible for the rule. And the reason why they're eligible is because similar to what I explained about Las Vegas, if I'm putting on a show on Broadway, I'm putting it on at a theater, I'm using stagehands or musicians or guild members. When my show ends, I don't take those employees with me and take them out of the plan. I leave. I don't tear down the theater. I don't bring the theater with me. I leave. Another show will follow who will also use the guild, stagehands, musicians. And that show will also contribute to the plan. So the reason we have the rule is that the plan is not harmed because one employer comes in for another employer. That's different from a manufacturer who, I close my factory, there may never be another factory that comes in. Or I close my factory and I move it to another jurisdiction and I don't contribute. Then the plan is harmed. But with entertainment employees, that just isn't what happens. And I'm seeing I'm almost out of time. So I'll reserve my time. Thank you, Kevin. Good morning, your honors. Christopher Humes on behalf of the NRA IATSE Local 720 Pension Trust. May it please the court. In the early 2010s, the musical Jersey Boys was a fixture on the Las Vegas strip. It ran for almost a decade. It broke record after record for longevity. But in 2016, when Jersey Boys finally closed its door on its run, it was something of a rarity because the work under the IATSE Local 720 Collective Bargaining Agreements had shifted away from large, full-scale theatrical productions to the convention and trade show industries. And similarly, the members of the IATSE Local 720 followed that business and engaged in the work in the trade show and convention industry. Now, also in 2016, when Jersey Boys ceased contributions to the plan, the plan had unfunded vested liabilities. Essentially, pension benefits that were promised, vested, but not fully funded. And as this court has heard through this matter and the previous matter, Congress enacted the Multi-Employer Pension Plan Amendments Act of 1980, or MEPA, and invented withdrawal liability for precisely the scenario we have here. So instead of transferring those obligations, those unfunded pension obligations to the remaining contributing employers in the plan, causing them to have to remedy it through increased contribution rates, withdrawal liability seeks to make the withdrawing employer pay its fair share of those unfunded pension obligation. Now, as you've heard, exceptions do exist for withdrawal liability for various industries, the building and construction industry, the trucking industry, and relevant here, the entertainment industry. And that's what this case is about, whether or not the entertainment exception applies to J.B. And as you've heard, J.B. has argued that it does. But the Pension Trust, however, respectfully requests that this court affirm the trustee's decision, the arbitrator's decision, and the district court's decision that all universally held that the entertainment exception does not apply here. And the Pension Trust asked this court to find this way for three reasons. First, the Pension Trust does not primarily cover employees in the entertainment industry as required for the entertainment exception to be effective. Second, J.B., with Jersey Boys' record-shattering run of almost a decade, the longest Broadway style show in Las Vegas history, does not perform the temporary kind of work contemplated by the entertainment exception. And lastly, the amendment that the trustees passed, limiting the entertainment exception to the long-running application to long-running employers under the plan is a perfectly valid and legal amendment under ERISA. And when applied to J.B., as J.B. concedes, it would cause J.B. to have to pay its withdrawal liability. Now, turning to my first point, when an employer wants to utilize the entertainment exception, certain statutory requirements have to be met. And one of those requirements is that the pension plan in question must primarily cover employees in the entertainment industry. Primarily, as we know through case law, means 50% or more. So for the entertainment exception to be effective, the pension plan 50% or more of its participants must be employees in the entertainment industry. And make no mistake, the pension trust is not an entertainment plan and has not been one for some time. For instance, in 1986, 94% of the income that was earned by pension plan participants came from entertainment work. Fast forward to 2016 when J.B. withdrew from the plan that percentage had dipped 54%, down to 40%. So I think that the difficulty with your position is that the statute contains one quantitative threshold, right? It has to primarily cover people in the entertainment industry. And throughout the statute, there's a number of similar standards, primarily, substantially, all in various places. And it seems like you want us to add another quantitative threshold that it has to primarily cover employees, you know, most of whose work is in the entertainment industry or, you know, some fraction of whose work or some dollar threshold of whose work is in the entertainment industry. And the statute doesn't say that. So what's the basis for reading in that kind of a threshold requirement? As the district court and the arbitrator noted, the statute on its face is ambiguous. Why is it ambiguous? I'd like to understand the omission of certain words that don't favor your position does not make it ambiguous. The language, in fact, is quite unambiguous. So why should we go to the next step, which I think is the question that Judge Miller is asking? You know, first, we have to find that it's ambiguous. Then there's the question of what language you would like us to write into the statute. So maybe you can answer both of those questions in tandem. Yes, Your Honor. The language, employees in the entertainment industry, it provides no benchmark to achieve, no metric to measure. There's no guidance on what is an employee. So you agree that the language is not ambiguous. It just doesn't include the threshold that you think is appropriate. And maybe it is appropriate, but why can we as a court red line in or blue pencil in the language that perhaps should be there but is not there, is clearly not there? It's clearly not there, Your Honor, those words. But the statute itself, it's subject to multiple reasonable interpretation. As the district court noted, to do this analysis, you have to draw the line somewhere. And the statute doesn't provide where that is. And so— Your friend on the other side argues that where that line is, is that the employer has to be an entertainment employer, that there's sort of a backstop to just having any person, including those restaurant workers who are singing happy birthday or your opposing counsel singing in the shower, that that is not going to allow them to be included into this because you still have the threshold with respect to the entertainment employer. Yes, but the other practical effects of J.B.'s interpretation is that any amount of time worked in the entertainment industry, no matter what, even if it was decades ago, is going to transform an entertainment or a person into an entertainment employee for all time. And for instance, just to demonstrate another omission within the same phrase, employees in the entertainment industry, while it doesn't provide a benchmark, it also doesn't provide what you're supposed to look at to analyze. And J.B. and the plan both agree that we're looking at wages, but the statute doesn't say that. In fact, contribution base units is used in a variety of other places in MEPA, 29 U.S.C. 1385, the partial withdrawal liability statute. Contribution base units is used there. And so under J.B.'s theory, we shouldn't be able to look at wages because if it's used somewhere else in MEPA, that means Congress didn't want us to examine contribution base units in this statute, much like the argument regarding primarily. It's not that Congress was being purposeful in its language. It's that Congress didn't provide any language to develop a rule or to develop guidance. And so that's why the statute is ambiguous, because of lack of clarity, not just on the metric, but also on a variety of other things, such as what you look to determine if a person is an entertainment employee. So because of that ambiguity, this court is permitted to look at legislative history, canons of construction, and one of the most widely accepted canons of construction regarding ERISA and MEPA are that they are remedial statutes to be construed broadly in the participant's favor, and exceptions to those statutes, such as the entertainment exception for withdrawal liability, must be construed narrowly. Okay, I think I might have taken you away from answering Judge Miller's question. What about the canon of construction relating to the fact that Congress knows how to use certain words, and in fact, in this particular provision did, but not in the place that you would prefer it to be? Yes, Your Honor, and I guess what I was trying to do is answer both questions, is that I feel that the contribution base unit example is falls in the same area because while Congress didn't write in primarily, it also didn't write in contribution base units, but the fact is that both parties are looking at wages, so we agree, but that's not what the statute says. So why, if the statute is clear on its face, are we permitted to use wages when contribution base units is used otherwise other places in the statute? It should be prohibited under J.B.'s argument, but J.B. looks at wages. So I don't see how you reconcile those two things without the statute being plainly ambiguous. I'm not sure I'm following. So is your argument that because there isn't a dispute about using wages as a measurement of what makes an entertainment employee, and both sides agree and do that, that somehow that should mean that we place the same sort of limitation for the primarily, even though those seem like apples and oranges to me. I'm not really following your argument. My argument, Your Honor, is that there are necessary pieces of information that are needed to conduct this analysis. One is, where is the line? How much do you need to be in the entertainment industry to be an employee in the entertainment industry? But another example of what you need to look for in this statute that's not there is how do you determine, not how much, but what do you even look at to determine a person if they're in the entertainment industry? And both of the parties agree that we're looking at wages. And my point is that if you apply the same rationale regarding not writing in the word primarily to wages, because contribution-based units are used in another part of MEPA, then under that theory, we should be prohibited from looking at wages because it's used somewhere else. And so therefore, Congress didn't mean to use it here, but yet both parties are still looking at wages. And so I think that demonstrates that the statute's not clear on its face, did not provide any guidance. And taking this to the logical conclusion is that J.B.'s argument is that any amount at any time, in this court, another canon of construction is that we don't seek to provide absurd results in the fact that somebody could be labeled as an entertainment employee for decades after they work one day in the industry. That would be an absurd result. People change. Industries change. And so does the makeup of pension plan participants. And the law should account for that fact. You said in your brief and then again this morning that you are asking us to affirm the judgment of the district court, correct? Yes, Your Honor. And yet you filed a cross appeal. What is the purpose of the cross appeal? Your Honor, in finding for the pension plan, the court focused its analysis on the issue of whether or not the plan was an entertainment plan under MEPA. But in the course of the litigation, which went from arbitration to a district court appeal to back to arbitration to another district court appeal, issues such as the amendment that the trustees made, whether or not JB was temporary, those were ultimately not decided. And so the pension trust cross appealed to have those issues also considered by this court. But those are just, those are alternative grounds for affirming the judgment that's in your favor, right? You're not seeking any alteration of the judgment, are you? No, Your Honor. So then, I guess, well, we are where we are. You got an extra brief out of it. But a cross appeal is appropriate when somebody is trying to alter, when the appellee is trying to alter the judgment in his favor, not when he just wants to make more arguments for why the judgment should stay the same. Understood, Your Honor. I can assure you that I wasn't trying to circumvent the court's rules. Just in case you lost on one issue, you'd have another issue that you could bring. But you could do that without cross appealing, just... Yes, Your Honor, I understand. So to wrap up the first point, as far as... This is your first and last, because you have 30 seconds. Oh, you're right, Your Honor. I guess that's the first and last. I apologize. To sum up, the remaining points are outlined in the brief. But the IATSE Local 720 Pensions Trust respectfully requests that this court affirm the lower court's order, as well as the arbitrator and the trustee's decisions. Thank you. All right, thank you, counsel. Your rebuttal. I'll be really, really quick. The only point I want to make is that to the question of how do we figure out if someone's an entertainment employer. We use wages because that's what their audit used was wages. We were using their audit. If they use CBUs, we'd have been fine using CBUs. Our point is that over 80% of these people do some work in the entertainment industry. And the last thing I want to point out is that the participants in this plan are all members of the Stagehands Local 720 Union, a union that advertises itself as the entertainment union of Las Vegas. These are stagehands, like entertainment technicians. They are trained to build stages, operate lights, run audiovisual. Sometimes an employer will come into town and they might be doing a trade show. They'll go to the union hall. They'll get their stagehands. Next week, a music concert might be in town. They might need stagehands. They will go to the union hall. They might grab the same people. If you're a 720 stagehand, you're trained to build stages, operate lights, run sound, whether it's at a trade show, whether it's at a convention, whether it's at a concert, a theater production. You are trained to do all entertainment type work that's going to be performed in Las Vegas. But the council, the statute says it primarily covers employees in the entertainment industry. Do you think that statute is ambiguous? No, and this court has... What do we get from the text of this statute that tells us, within the confines of the statute, how to determine whether someone is primarily in the entertainment industry? The statute doesn't say that someone has to be primarily in the industry. The statute says... Primarily covers employees in the entertainment industry. That's a difference. There's two parts. The plan says the plan has to cover... Primarily has to cover employees in the industry, but the employees just have to be in the industry. But in the statute, how do we get that from the statute? How does the statute, the language of the statute, help us in making that determination? Because you have one way of saying we should determine it. They have another way of saying it. So to me, that indicates that the statute is ambiguous. I'm asking you to apply the language that's written in the statute. They're asking you to apply the language that they adopted. What language written in the statute are you asking us to apply? Employees in the industry with no qualifier. If you're an employee and you work for a music employer, you work for a theater employer, you work for a dance employee, work for audiovisual employer. If you work for any of those main employers, you are a stagehand of 720 who's working for an entertainment employer. That's what the statute says, and that's all we're asking. Just apply the plain language of the statute. Thank you, counsel. Thank you, both counsel. The case just argued is submitted for decision by the court. At this point, we're going to go back and we're going to conference on the cases. Our law clerks are here to talk to any law students or anyone else who wants to talk with them. After we've conferenced, we'll come back out and we'll talk to the students. So this session for this court stands adjourned. All rise. This court for this session stands adjourned.
judges: RAWLINSON, MILLER, DESAI